FILED

2010 May-18  AM 08:18
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| JAMES P. PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-08-S-1869-NW |
| | ) | |
| NORTHWEST SHOALS | ) | |
| COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, James P. Price, who is proceeding *pro se*, filed a Second Amended
Complaint on March 6, 2009, asserting claims against the following defendants:
Northwest Shoals Community College ("the College"); Shelia Smith, the Director of
Nursing Education at the College; Riverbend Center for Mental Health
("Riverbend"); and Ken Delano, an employee of Riverbend.[1]  Plaintiff's claims are

---

[1] *See* doc. no. 28 (Second Amended Complaint).  The Second Amended Complaint also
named "other unnamed employees of [the college] in both their official and individual capacities"
and "other unnamed employees of [Riverbend] in both their official and individual capacities."
Those claims are not viable, however, because there is no fictitious party practice in federal courts.
*Cf.* 28 U.S.C. § 1441(a) (last sentence) ("the citizenship of defendants sued under fictitious names
shall be disregarded" for purposes of removal); *see also, e.g., New v. Sports & Recreation, Inc.*, 114
F.3d 1092, 1094 n.1 (11th Cir. 1997) (noting that plaintiff "conceded that fictitious party practice
is not permitted in federal court and, thus, her failure to name the parties required that the court strike
the parties"); *Wiggins v. Risk Enterprise Management Limited*, 14 F. Supp. 2d 1279, 1279 n.1 (M.D.
Ala. 1998) ("[T]here is no fictitious party practice in the Federal Courts."); *Floyd v. Allstate
Insurance Company*, 989 F. Supp. 1435, 1436 n.1 (M.D. Ala. 1998) ("[T]he fictitious Defendants
named in Plaintiff's Complaint are due to be dismissed, there being no provision for fictitious party
practice under federal law."); *McCree v. Sam's Club*, 159 F.R.D. 572, 574 n.1 (M.D. Ala. 1995)
("there is no provision for fictitious party practice under federal law"); Federal Rule of Civil

difficult to discern, but he appears to assert federal claims pursuant to Titles II and III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act"); the equal protection and due process clauses of the Fourteenth Amendment; the Fourth Amendment right to privacy; 42 U.S.C. § 1985; and the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232(g)  ("FERPA"), as well as state law claims for tortious interference with contract, breach of contract, negligence, and civil conspiracy.  All of plaintiff's claims arise out of his dismissal as a student from the College's Associate Degree Nursing program ("ADN") due to an alleged violation of the College's drug testing policy.

The case currently is before the court on the motion for summary judgment jointly filed by the College and Shelia Smith, Director of Nursing Education at the College.[2] Upon consideration of the motion, the pleadings, the briefs, and the parties' evidentiary submissions, the court concludes that the motion should be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any

---

Procedure 10.

[2]Doc. no. 33.

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Parties who appear *pro se* are afforded a leniency not granted to those who are represented by counsel. *Cf., e.g.*, *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a *pro se* complaint filed by a state prisoner], 'however inartfully pleaded,' are held to 'less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (same); *Woodall v. Foti*, 648 F.2d 268, 271 (5th Cir. 1981)[3] ("A *pro se* complaint, however inartfully drafted, must be held to less rigorous standards than the formal pleadings prepared by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (quoting *Haines*).

Even so, the leniency accorded *pro se* litigants is not unqualified.  A *pro se* plaintiff "must still meet the essential burden of establishing that there is a genuine issue as to a fact material to his case." *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th

---

[3]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

Cir. 1997) (citing *Brown v. Crawford*, 906 F.2d 667, 669-70 (11th Cir. 1990)).

## II. UNIFORM INITIAL ORDER BRIEFING REQUIREMENTS

The Uniform Initial Order filed in this action as document number 20 contains the following requirements regarding the manner of stating facts in support of, and in opposition to, motions for summary judgment.

### D.    Manner of Stating Facts

All briefs submitted either in support of or opposition to a motion must begin with a statement of allegedly undisputed relevant material facts set out in *separately numbered paragraphs.* Counsel must state facts in clear, unambiguous, simple, declarative sentences. All statements of fact must be supported by specific reference to evidentiary submissions.

### 1.    Moving Party's Initial Statement of Facts

The moving party shall list in *separately numbered paragraphs* each material fact the movant contends is true and not in genuine dispute, and upon which the moving party relies to demonstrate that it is entitled to summary judgment. Each such statement must be followed by a specific reference to those portions of the evidentiary record that the movant claims supports it.

### 2.    Opposing Party's Statement of Facts

Each party opposing a summary judgment motion also must submit a statement of facts divided as follows.

### a.    Response to Movant's Statement

The first section must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The

non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts. <u>Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based</u>. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

### b. Additional Undisputed Facts

The second section may contain additional, allegedly undisputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment. The second section of the opposing party's statement of facts, if any, shall be clearly designated as such. The opposing party should include only facts which the opposing party contends are true and not in genuine dispute.

### c. Additional Disputed Facts

The third section may contain additional, allegedly disputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment. The third section of the opposing party's statement of facts, if any, shall be clearly designated as such. <u>Each statement of allegedly disputed facts must be followed by specific reference to those portions of the evidentiary record which both support and contradict the alleged fact.</u>[4]

Importantly, the subsection governing the opposing party's additional undisputed facts is followed by this footnote: "Each statement of fact should be supported by its own evidentiary citation, regardless of the fact that more than one statement of fact

---

[4]Doc. no. 20 (Uniform Initial Order), at 15-17 (italicized and boldface emphasis in original, underlined emphasis supplied) (footnotes omitted).

allegedly is supported by the same specific reference to the evidentiary record or more than one statement of fact is contained in the same numbered paragraph."[5]

In his forty-nine page response brief, plaintiff did not include a statement of his own alleged undisputed or disputed material facts.[6]  He did, however, make lengthy statements and arguments in opposition to defendants' statement of allegedly undisputed relevant material facts.  Even so, most of plaintiff's statements and arguments are not supported by any citation to the evidentiary record.  As such, they are not sufficient to create a genuine issue of material fact with regard to any of the evidence advanced by defendants, or with regard to any of defendants' statements of fact that are supported by the evidence of record.  In short, the court will only consider legal arguments that are supported by the evidence.

### III. SUMMARY OF FACTS

Plaintiff, James Price, enrolled as a student in the College's Associate Degree Nursing ("ADN") Program in the Fall of 2005.[7]  The full text of the Drug Screening

---

[5]*Id.* at 17 n.4.

[6]In their reply brief, Smith and the College point out that plaintiff's response brief exceeds the page limit dictated by the Uniform Initial Order.  *See* doc. no. 45 (defendants' reply brief), at 1.  Those defendants accordingly request the court to strike part or all of plaintiff's brief.  Defendants are, of course, correct that plaintiff exceeded the page limit.  Even so, the court concludes that striking plaintiff's brief is not the proper course of action.  This decision will not prejudice defendants because, even considering plaintiff's brief in its entirety, defendants' motion for summary judgment still is due to be granted.

[7]Doc. no. 35 (defendant's evidentiary submission), Exhibit 1 (Affidavit of Glenda Colagross), at ¶¶ 1-5; Exhibit 2 (August 12, 2005 admission letter from the College to plaintiff).

Policy in the 2006-2007 version of the College's Student Handbook[8] reads as follows:

It is the policy of Northwest-Shoals Community College to provide a drug-free learning and work environment. Possession, distribution, or the use of drugs and alcohol is prohibited. In addition, as stipulated by health care Agencies with which Northwest-Shoals Community College Division of Health Studies contracts for clinical experience, students must abide by the policies established by these Agencies relative to drug screening and any subsequent revisions to these policies in order to participate in clinical experiences at the Agencies.

This policy includes annual drug screening, random drug screening, and reasonable suspicion drug screening. Students may be screened for a variety of substances by buccal swab, urine and/or other methods selected by the testing or clinical Agency. All fees for all drug and alcohol screening are paid by the student.

Substances included in the drug screening include, but are not limited to:

A.   Amphetamines
B.   Barbiturates
C.   Benzodiazepines
D.   Cocaine
E.   Opiates
F.   Methadone
G.   Marijuana (THC)
H.   Creatinine (urine)
I.   Ecstasy
J.   Oxycontin
K.   Alcohol

**Annual Screening**

---

[8]Plaintiff argues that the procedures set forth in the 2005-2006 handbook, not the 2006-2007 handbook, should have applied to his situation. That argument is meritless, as plaintiff's initial positive drug screen occurred at the beginning of the 2006-2007 school year.

A.  The College Catalog and Student Handbook inform students enrolled in the Division of Health Studies programs that participation in drug screening is a program requirement. Students enrolled in the Associate Degree and Practical Nursing programs will receive a copy of the Drug Screening Policy upon admission.

B.  <u>Pre-clinical</u> drug screening for incoming freshman students will be conducted in the first semester prior to the first clinical experience.  For sophomore students, the annual drug screening will be conducted during the fall semester of the second year.

C.  Drug screening is conducted by a drug testing company designated by the Division of Health Studies at a cost of $33 per student per screening.  The drug screening fee must be paid in advance, at registration, on either campus in the Cashier's office.

D.  Students in the Associate Degree Nursing program will submit a copy of the receipt to the office clerk and for Practical Nursing students, to the NUR 102 Course Leader or designee.

E.  All students accepted for admission will be required to complete a consent form for drug screening annually in the fall.  On this form the student must list all medications taken.  These signed consent forms will be maintained on file in each program.

**Random Drug Screening**

A.  Associate Degree and Practical Nursing Programs may conduct random drug screening anytime at the student's expense.

B.  A random selection process is used to identify students for random drug screening.

**Procedure for Annual and Random Drug Screening**

A.  Students will have paid for the screening, submitted the receipt and the signed consent for drug screening form to

the respective program.

B.    Students must present their College ID when reporting for drug screening at the designated time and place.

C.    Students failing to report for screening at the designated time must contact the Chairperson of Health Studies within 24 hours following the designated time and date of the scheduled screening.  The Chairperson will determine the disposition of the student after consultation with the Director of the nursing program.

D.    Results of drug screening will be sent to the Chairperson of Health Studies at Northwest-Shoals Community College.

E.    Students will, whenever reasonably possible, be informed of the screening results by the Chairperson of Health Studies within seven (7) calendar days of the Chairperson receiving the results.

F.    If the drug screen is positive, students may elect to have the positive screen retested by Gas Chromatography Mass Spectrometry (GCMS) at an additional cost to the student of $50.  If this request is not made within 24 hours of learning about the positive result, the initial screening result will be considered confirmed.

**Outcome of Annual and Random Drug Screening**

A.    A positive drug screening result will prohibit students from attending any required clinical component until the positive screening result is either confirmed or refuted.  Students will be allowed to attend the lecture and laboratory components while the confirmation process is ongoing.

    a.    First confirmed positive test — The student is withdrawn from the respective health program by the Chairperson of Health Studies.  In nursing courses with a clinical component, students would receive a clinical grade of "Unsatisfactory" which would result in a grade of "F" in the course.  Students will be required to participate in a substance abuse treatment program prior to being considered for readmission. It is strongly recommended that the student visit the

-10-

website of the Board of Nursing in the in the state where initial licensure will be sought to identify a board-approved substance abuse treatment program and any other stipulations that may affect future licensure. The length of the substance abuse treatment program will be determined by the treatment program counselor. If the student wishes to be considered for readmission, the Chairperson of Health Studies should be informed of the expected completion date of the substance abuse treatment program and whether or not student successfully completed the program.

A negative follow-up drug test along with proof of successful completion of abuse treatment program will be required before students are considered for readmission to any health program. Students will be required to submit to follow-up drug testing for up to 12 months.

b.      Second confirmed positive drug screen or refusal to participate in a substance abuse treatment program and/or follow-up drug testing will result in permanent dismissal from the health program, ineligibility for admission to other health programs offered by Northwest-Shoals Community College, and forfeiture of any allied health scholarships.

B.      Students with one confirmed drug test who have complied with the drug screening policy may apply for readmission to the respective health program at the beginning of the next admission cycle. The student will be considered for readmission according to the criteria as outlined in the respective program.

**Reasonable Suspicion Screening.**

A.      Students are subject to submit to reasonable suspicion screening if while in the classroom, laboratory, or while on duty in any health care facility or other work location as a representative of the respective health program they exhibit

-11-

behavior that may indicate using, misusing, or being under the influence of alcoholic beverages, illegal drugs or drugs which impair judgment.

B.    As stated previously, students, while participating in clinical experiences, are subject to the drug screening policy of any clinical Agency contracted with Northwest-Shoals Community College Division of Health Studies.

C.    Behavior that may raise reasonable suspicion in any setting includes any behaviors stated in the substance abuse policies of the clinical Agencies as well as those behaviors stated here for Northwest-Shoals Community College.   These behaviors include but are not limited to:

a.    Observable phenomena, such as direct observation of drug or alcohol use and/or physical symptoms or manifestations of being under the influence of a drug or alcohol.   These behaviors include but are not limited to slurred speech, unsteady gait, confusion, pinpoint or dilated pupils, euphoria, or somnolence.

b.    Presence of an odor of alcohol.

c.    Abnormal conduct or erratic behavior; excessive absenteeism or tardiness as defined by the Programs; or deterioration in performance.

d.    A workplace incident/accident.

e.    Evidence of tampering with a drug test.

f.    Suspected theft of medications, including controlled substances while on the unit.

g.    Information that the individual has caused or contributed to an incident in the clinical Agency that created an unnecessarily greater likelihood of a resulting injury to any person or property, than should occur in a properly conducted situation or endeavor.

h.    Evidence of involvement in the use, possession, sale, solicitation, or transfer of illegal or illicit drugs or alcohol while enrolled in  Health Studies program.

**Procedure for Reasonable Suspicion Screening**

When the clinical instructor or Agency administrator perceives

-12-

behavior that may indicate use/abuse of drugs or alcohol, the following procedure will be followed:

A.    Instructor will remove the student from the patient care or assigned work area and notify the clinical agency supervising personnel and the Director of the Nursing program.

B.    The student will be asked to submit to drug screening according to the Agency policy at the student's expense.

C.    If the student admits to alcohol or drug use, he/she will still be required to submit to drug screening.

D.    If a student refuses "reasonable suspicion" testing, the instructor will remove the student from the clinical setting pending a full investigation.

E.    After testing, the student/instructor may call for assistance with transportation.

F.    The student is withdrawn from the clinical component until the results of the drug screening are known and/or confirmed.  The student may attend lecture and laboratory during this time.

**Outcome for Reasonable Suspicion Testing**

A.    Students will, whenever reasonably possible, be informed of the screening results by the Chairperson of Health Studies within seven (7) calendar days of the Chairperson receiving the results.

B.    If the results of the test(s) are negative for drugs, alcohol, or other illegal substances, or for non-prescribed legal substances, the student shall meet with the Chairperson for Health Studies within 24 hours of learning the test results to discuss the circumstances surrounding the impaired clinical behavior and the conditions required for the student's return to clinical.  Medical evaluation may be required to rule out medical causes for the behavior before the student can return to clinical.

C.    If the results of the test(s) are positive for drugs, alcohol, or other illegal substances, or for non-prescribed legal substances, the student may request the positive drug screen

be retested by Gas Chromatography Mass Spectrometry (GCMS) at an additional cost to the student of $50.  If this request is not made within 24 hours of learning about the positive result, the initial screening result will be considered confirmed.

D. A confirmed positive reasonable suspicion drug screening will result in immediate withdrawal of the student from all nursing courses by the Chairperson for Health Studies.  In nursing courses with a clinical component, the student would receive a clinical grade of "Unsatisfactory" which would result in a grade of "F" in the course.

E. To be eligible for readmission, the student will be required to participate in a substance abuse treatment program during this withdrawal period.  It is strongly recommended that the student visit the website of the Board of Nursing in the state where initial licensure will be sought to identify a board-approved substance abuse treatment program and any other stipulations that may affect future licensure.  The length of the substance abuse treatment program will be determined by the treatment program counselor.  The Chairperson of the Health Studies should be informed of the expected completion date of the substance treatment program and whether or not the student successfully completed the program.

A negative follow-up drug test along with proof of successful completion of abuse treatment program will be required before students are permitted to apply for readmission to any health program.  Students will be required to submit to follow-up drug testing for up to 12 months.

F. If the student has a certificate or license from a State Board of Nursing, the positive drug screen will be reported to the Board.

G. Any student who has a second positive drug screen on a reasonable suspicion screening or a refusal to participate in a substance abuse treatment program and/or follow-up drug testing will result in permanent dismissal from the nursing

-14-

program; ineligibility for admission to other health programs offered by Northwest-Shoals Community College, and forfeiture of any allied health scholarships.

## Confidentiality

The Chairperson of Health Studies will receive all test results which will be maintained in a locked file on campus. Confidentiality of test results will be maintained with only the Chairperson of Health Studies, the President and his/her designated Administrative Officer and the student having access to the results with the exception of legal actions that require access to test results.

## Readmission

Students who are eligible for readmission under the Drug Screening Policy must:

A.   Submit an application for readmission to the respective nursing program.

B.   Submit a letter from a treatment agency verifying completion of an appropriate substance abuse treatment program and a statement that the student will be able to function effectively and provide safe and therapeutic care for clients in a clinical setting.

C.   Submit to an unannounced drug screen at the student's expense prior to readmission. A positive screen at this time will result in ineligibility for readmission.

## Additional Information

Drug screening programs suggested or required by the Alabama Board of Nursing, Northwest-Shoals Community College, and/or various Agencies with which the College contracts, may vary from time to time in any or all of their aspects. Students will be required to comply with screening which will satisfy any program or requirement established by the Alabama Board of Nursing or any health care Agency with whom the College contracts for clinical experience, whether annual drug screening, random drug screening or reasonable suspicion drug screening.

Some of the classes of drugs for which screening will be conducted

are available by prescription from health care practitioners.  Prescription drugs prescribed to a student by an appropriate health care practitioner may nevertheless be subject to abuse and may give rise to reasonable suspicion testing.  The fact that student has a prescription for one or more of the classes of drugs which are legally prescribed by a health care practitioner does not necessarily, in and of itself, excuse the student from the effect of this policy.

## Education Program

A program of education on drug use and abuse shall be provided to all Associate Degree and Practical Nursing students.  This program should include, at a minimum, the following:

     1.     discussion of drug testing policy; and
     2.     distribution of education materials concerning the abuse of illegal drugs or alcohol.

## Publication of Policy

The College shall include the nursing Programs' Drug Screening Policy in the Student Handbook for each program, and other appropriate College publications to ensure adequate notice and distribution.  A copy of the policy may be requested from the Associate Degree nursing program.[9]

Plaintiff tested positive for the presence of Valium and Xanax, two forms of benzodiazepines, on August 3, 2006.[10]  The College consequently sent him a letter on August 14, 2006, stating:

Dear Mr. Price:

Per our meeting on August 11, 2006, this will confirm that you have been suspended from the Associate Degree Nursing Program due to a for-cause positive drug screen while at clinical on August 3, 2006.  As a result

---

[9]Plaintiff's Exhibit H, at 10-15.

[10]*See* Defendants' Exhibits 3 & 4.

of the positive drug screen, you must successfully complete and submit documentation to the ADN program prior to being considered for re-admission into the ADN program for summer 06/07.  It would be in your best interest to attend an Alabama Board of Nursing approved program. I am enclosing the approved programs listed on the ABN web site.  In addition to treatment, it is strongly recommended that you participate in aftercare and twelve step meetings prior to applying for re-admission. This involvement should continue if re-admitted and must be included with information submitted when applying for licensure.

In summary, in order to be eligible for consideration for re-admission you must:

- Provide documentation of successful completion of a drug treatment program with documented negative drug screens.
- Re-apply to the College.
- Re-apply to nursing by February 15th 2007.[11]

The foregoing letter was signed by J. Bret McGill, Assistant Dean of Instruction.  The

College sent plaintiff a second letter on May 9, 2007, stating:

Dear Mr. Price:

This letter is to inform you that your application for summer 2006-2007 readmission into the Associate Degree Nursing Program to repeat **NUR 201** at Northwest-Shoals Community College has been received.

On the day April 25th, 2007, when you turned in the application form, we reviewed the drug policy and the documentation you brought in. Please note that your application for readmission can only be considered if you comply with what [is] stated in the drug screening policy on page 15 of the Associate Degree Nursing Student Handbook 2006-2007.

- A letter from the treatment agency verifying completion of an appropriate substance abuse treatment program and a

---

[11]Defendants' Exhibit 4.

statement that the student will be able to function effectively and provide safe and therapeutic care for clients in a clinical setting.
•   Submit to an unannounced drug screen at the student's expense prior to readmission.

The above-mentioned letter & statement as well as the written report of the unannounced drug screen must be submitted directly from the treatment agency & drug screening company to Associate Degree Nursing Program and must be received by May 25th, 2007.  Otherwise, your application for readmission will not be considered.[12]

The May 9th letter was signed by defendant Shelia Smith.

During a May 30, 2007 meeting, the College's Admissions Committee decided to deny plaintiff readmission to the Associate Degree Nursing Program because "requested application requirements were not met prior to the February 15th deadline."[13]  The Admissions Committee met again on June 14, 2007 to consider plaintiff's reinstatement.  The minutes of that meeting read as follows:

It is the committee's recommendation that the previous determination for denial of reinstatement of James Price for the Summer 06-07 ADN Program stand due to the following reasons:

•   Student did not go into treatment until five months after dismissal from ADN Program.
•   Information submitted April 25, 20007 provided certificate of completion of a program with no specifics.  Also submitted was proof of drug screens/ upon review of drug screens, the 2/07/07 specimen was diluted and there was

_____

[12]Defendants' Exhibit 5.

[13]Defendants' Exhibit 6 (minutes of  May 30, 2007 meeting), at 2.

evidence that there had been omissions of some results. Consulted with Riverbend about omitted results and later found that there was a test performed on 2/14/07 that was positive which had not been submitted.

- Has had a positive drug screen within the past 120 days.
- Has not provided documentation of after-care to committee as was requested by committee at the May 29 appeal hearing.
- Was not documented as to being enrolled in an after care program at the Riverbend treatment facility per phone conversation with Mr. Delano on 5/29/2007. According to Mr. Delano, Mr. Price was provided with the dates and times which after-care would be provided at Riverbend during his outpatient treatment.

It is because of these factors that the Admissions Committee has decided to uphold their original decision not allowing James Price reinstatement for the Summer 06-07 ADN Program.[14]

Despite that initial decision, plaintiff convinced the Admissions Committee to formulate an alternative solution.  Dr. Humphrey Lee, the College's president, explained that solution to plaintiff in a letter dated June 15, 2007:

Dear Mr. Price:

On June 14, 2007, the Admissions Committee met to hear your second appeal requesting readmission into the Associate Degree Nursing Program for Summer Semester 2007.  This letter provides results of your appeal to the Committee.

After hearing your second appeal and reviewing documentation submitted from Douglas Price on behalf of James Price, the Committee voted to deny your request for readmission into the Associate Degree Nursing Program for Summer Semester 2007.

---

[14]Defendants' Exhibit 7 (Minutes of June 14, 2007 Admissions Committee Meeting), at 1.

However, based on your request for an alternative solution to your current situation, the committee proposes and accepts the following:

1.   Waiver of 12 month course reinstatement for Summer semester 07–08 ADN Program requirement with the following stipulations:

   A.   Student must enroll as an audit student in all nursing courses previously taken (NUR 102, 103, 104, 105, 106) meeting the College policies for audit students with the following requirements:

   i.   Attend at least 80% of class time theory as well as campus lab.

   ii.   Complete course requirements as dictated by course syllabus, including taking all tests and demonstration of proficiencies and skills as documented for each course.

Student must submit up to a maximum of 10 negative random drug tests throughout the two semesters of audit course curriculum, as well as understand that the random drug testing will continue throughout the program.   All requirements concerning follow-up care must be met effective immediately and are required to continue throughout the entire ADN Program.

It should be noted that if at any time a positive drug screen is submitted, it will result in permanent dismissal from the ADN Program and [you] will be considered ineligible for admission to any other health program offered at Northwest-Shoals Community College.

I would like to reaffirm the statements made by the Admissions Committee to Mr. Price that in the event that he successfully completes the ADN Program, that according to the 06-07 student handbook pages 28 and 29, Northwest-Shoals Community College cannot guarantee that the clinical agencies will accept said student for clinical experiences. Program completion does not guarantee the right to take licensure examination (see pg. 29).[15]

---

[15]Defendants' Exhibit 8, at 1-2.

Plaintiff signed a written statement on June 15, 2007, acknowledging the following:

I understand that I must complete the following requirements as stated below, without exception, in order to be considered enrolled in the Associate Degree Nursing Program for summer 2008.

1.   Complete all requirements of the Riverbend after/follow-up care program in its entirety.  This program, and its requirements, is approved by the Alabama Board of Nursing.

2.   Submit to random drug screens with negative results throughout the two semester audit of nursing courses, as well as understand that the random drug testing will continue throughout the program.

3.   Enroll as an audit student in all nursing courses previously taken (NUR 102, 103, 104, 105, 106).

4.   Attend at least 80% of class time theory as well as campus lab.

5.   Complete course requirements as dictated by course syllabus, including taking all tests and demonstration of proficiencies and skills as documented for each course.

I understand that failure to complete any one of the above stipulations and/or a positive drug screen will result in permanent dismissal from the ADN program and I will be considered ineligible for admission to any other health program offered at Northwest-Shoals Community College.[16]

On September 12, 2008, a random drug test administered to plaintiff revealed the presence of methadone, one of the substances whose use is prohibited by the Drug Screening Policy.[17]  Furthermore, on September 23, 2008, defendant Riverbend Center

---

[16]Defendants' Exhibit 9.

[17]*See* Defendants' Exhibit 12.

for Mental Health sent plaintiff a letter stating:

> After considering the circumstances regarding your admission of the use of methadone throughout your treatment experience here and due to the basic dishonesty involved, it is the decision of the Substance Abuse Services team that you be discharged from our program.  Should you wish to utilize our services in the future, you may contact us after the required 90-day waiting period.[18]

The September 23 letter was signed by defendant Ken Delano, a Substance Abuse

Therapist at Riverbend.  Due to these two occurrences, the College decided to dismiss

plaintiff from the ADN Program, and sent plaintiff a letter to that effect on September

29, 2008, stating:

> Dear Mr. Price,
>
> This letter is to inform you that you have been dismissed from the Associate Degree Nursing Program at Northwest-Shoals Community College, due to non-compliance of the stipulations set forth on June 15th, 2007 reinstatement requirements.  The final decision was made following review of the information received from Riverbend Center for Mental Health.
>
> As acknowledged with your signature on June 15, 2007, you were fully aware of the stipulations of your re-admission and the consequence of non-compliance, "I understand that failure to complete any one of the stipulations and/or a positive drug screen will result in permanent dismissal from the ADN Program and I will be considered ineligible for admission to any other health program offered at Northwest-Shoals Community College."[19]

---

[18]Defendants' Exhibit 15.

[19]Defendants' Exhibit 13.

-22-

# IV. DISCUSSION

Upon review of the evidence and the briefs, the court concludes that plaintiff has not presented any evidence to support a federal claim against the College or Shelia Smith, and that the supplemental state law claims against those defendants also should be dismissed.

## A.    FERPA

Any claim for violation of plaintiff's right to privacy pursuant to FERPA is not viable because there is no private right of action under that statute.  *See Gonzaga University v. Doe,* 536 U.S. 273, 287 (2002).

## B.    ADA and Rehabilitation Act

To the extent plaintiff alleges discrimination pursuant to Titles II and III of the ADA or the Rehabilitation Act, he has no evidence to support such a claim. First of all, Title III of the ADA "prohibits discrimination by *private entities* in places of public accommodation." *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1272 (11th Cir. 2006) (emphasis supplied).  The College is a *public entity*, not a private one; therefore, Title III does not apply.

To support a claim under *Title II* of the ADA,

a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was

-23-

> otherwise discriminated against by the public entity; and (3) that the
> exclusion, denial of benefit, or discrimination was by reason of the
> plaintiff's disability. *See Shotz v. Cates*, 256 F.3d 1077, 1079 (11th
> Cir.2001) (citing 42 U.S.C. § 12132).

*Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007). The same

standards apply to any claim asserted under the Rehabilitation Act. *See, e.g., Cash v.

Smith,* 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000) (holding that, because cases

involving the Rehabilitation Act are governed by the same standard as cases involving

the ADA, Rehabilitation Act cases usually are precedent for ADA cases and *vice

versa*).[20]

Plaintiff cannot support a *prima facie* case of discrimination under Title II of the

ADA. As an initial matter, while plaintiff references his past drug use and his history

of drug treatment, he does not offer any argument as to why those facts render him a

"qualified individual with a disability." Although plaintiff is entitled to *some* leniency

because he is proceeding *pro se,* the court is not obligated to formulate arguments on

his behalf. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007)

---

[20]Section 504 of the Rehabilitation Act provides, in pertinent part, that:

> No otherwise qualified individual with a disability in the United States, as
> defined in section 705(20) of this title, shall, solely by reason of her or his disability,
> be excluded from the participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal financial assistance
> or under any program or activity conducted by any Executive agency or by the United
> States Postal Service.

29 U.S.C. § 794(a).

(refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (superseded by statute on other grounds as stated in *Flanigan's Enterprises, Inc. v. Fulton County,* 596 F.3d 1265 (11th Cir. 2010) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)). *See also Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997) (explaining that "the onus is upon the parties to formulate arguments"); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it").

Even assuming that plaintiff could establish a legally protected disability related to his drug use and/or history of drug treatment, he does not have evidence to support the other elements of a *prima facie* case of disability discrimination under either the ADA or the Rehabilitation Act. Plaintiff argues that he was excluded from the ADN Program and treated differently from other students because of his past drug use. However, he provides no evidence that any differential treatment he may have suffered was because of his alleged disability.  Instead, the evidence shows that plaintiff was released from the ADN Program because he did not satisfy all of the requirements of his re-admission, including both a series of negative drug screens and the successful

completion of an after-care program.  Those are not discriminatory reasons.

Plaintiff attempts to argue that the very requirements for his re-admission were discriminatory because they were stricter than the requirements set forth in the Student Handbook.  Specifically, plaintiff argues that the College required him to meet all the requirements for *readmission* into the ADN Program before he was allowed to even *reapply* to the program.  The court finds no evidence to support this argument.  Even if there were such evidence, the court cannot discern the relevance of the "reapply vs. readmission" distinction.  The fact remains that plaintiff did not satisfy all of the *agreed-upon* requirements for readmission.  He complains that he missed the February 15, 2007 deadline for reapplying to the ADN Program because J. Bret McGill, the Assistant Dean of Instruction, informed him that he should not re-apply until he had actually completed a drug treatment program, and that, as long as he met the May 26, 2007 deadline for general enrollment, he would not have any problems.  However, plaintiff has no evidence that Mr. McGill so advised him.  Even if there was such evidence, however, it would not be material to the issue of discrimination.  Even *after* plaintiff missed the February 15 reapplication deadline, the College readmitted him to the ADN Program on a conditional basis.  It was not until plaintiff subsequently failed to satisfy all the conditions of his readmission that the College permanently dismissed him from the program.

Plaintiff also argues that the College's evaluation of his September 12, 2008 drug screen, which showed the presence of methadone, was inconsistent with the College's prior "pattern and practice" of evaluating other students' drug screens that reveal the presence of prescribed medications. He does not, however, provide any evidence of what the College's past "pattern and practice" of dealing with similar situations was. He also provides no evidence of any other students who were treated more favorably than he was. Accordingly, this argument does not support plaintiff's theory that defendants acted discriminatorily.

Furthermore, the court is not persuaded by plaintiff's argument that the conditions of his readmission to the ADN Program in June of 2007 were unfair or unreasonable, because plaintiff signed a statement on June 15, 2007, agreeing to those conditions.[21]

## C.   Equal Protection and Due Process Violations

Plaintiff appears to assert both procedural and substantive due process violations, in addition to an equal protection violation, all of which fall under the Fourteenth Amendment to the United States Constitution.

---

[21]Plaintiff makes some suggestion that the agreement he reached with the College on June 15, 2007 is not valid, either because there was no meeting of the minds, or because the agreement was unconscionable or obtained by duress. *See* doc. no. 42 (plaintiff's brief), at 3-4. He does not develop that argument beyond a mere suggestion, however, and the court consequently will not consider it.

To support his *procedural* due process claim, plaintiff argues the following:

> Nevertheless, with no hearing whatsoever the arbitrary decision was made to permanently remove Price from the ADN program.  This removal of Price constituted an adverse disciplinary action and as such required a due process hearing with specific regard to whether or not Price had violated the terms of the contract with the school; a hearing where Price might speak and present evidence on his own behalf challenging any allegation of misconduct prior to a final determination of his fate.[22]

Plaintiff does not develop this argument any further, and he does not cite any legal authority to support it.  Importantly, he does not explain why he had a constitutionally protected property interest in his participation in the ADN Program.  Consequently, plaintiff cannot support a claim for denial of procedural due process.

With regard to his claims for *substantive* due process and equal protection violations, plaintiff argues that defendants' alleged actions are subject to strict scrutiny.[23]  While plaintiff apparently concedes that he is not a member of a suspect class,[24] he does argue that defendants have violated his fundamental rights to an education, to acquiring knowledge, and to medical treatment.  However, the Supreme Court has specifically held that there is no fundamental right to an education, even at

---

[22]Doc. no. 42 (plaintiff's brief), at 32-33.

[23]Strict scrutiny requires a court to evaluate whether a law or other governmental action that infringes upon a fundamental right or discriminates against a member of a suspect class "'furthers a compelling interest and is narrowly tailored to achieve that interest.'"  *Citizens United v. Federal Election Commission,* – U.S.– , 1130 S. Ct. 876, 898 (2010) (quoting *Federal Election Commission v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 464 (2007)).

[24]*See* doc. no. 42 (plaintiff's brief), at 29.

the elementary and high school levels.  *See San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 33-39 (1973).  It would therefore be incongruous to recognize a fundamental right to education at the college level.  *See Federov v. Board of Regents of University of Georgia,* 194 F. Supp. 2d 1378, 1391 (S.D. Ga. 2002) (holding that "attending dental school is not a fundamental right").  Furthermore, while the Supreme Court in *Meyer v. Nebraska* mentioned that the due process clause encompasses a right "to acquire useful knowledge," this court could locate no case recognizing that right as "fundamental" in the sense that any infringement warrants strict scrutiny review.  *See Meyer v. Nebraska,* 262 U.S. 390, 399 (1923).  Similarly, the court could locate no federal case recognizing a fundamental right to medical treatment.  The only case cited by plaintiff on this point recognized a fundamental right to *refuse* medical treatment, not a fundamental right to *receive* medical treatment.  *See Washington v. Glucksberg,* 521 U.S. 702, 719 (1997).

As plaintiff is not a member of any suspect class, and he also has not demonstrated a violation of any fundamental right, his due process and equal protection claims are entitled to only rational basis review.  It cannot legitimately be disputed that defendants had a rational basis for excluding plaintiff from the ADN Program.  Plaintiff failed to comply with the *stipulated* conditions for his readmission to the Program, and the College excluded him on those grounds.  Plaintiff does not even argue in his brief

that there was no rational basis for the College's decision.  He only argues that, *if* the College concluded that he posed a threat to other students or patients because of his methadone use, there would be no rational basis for that conclusion.  Once again, plaintiff does not develop this argument any further, and he does not support it with citation to legal authority.  Furthermore, there is no evidence that the College actually *did* consider him a threat to others because of his methadone use, or that the College terminated him from the ADN Program as a result.  For all of these reasons, plaintiff has failed to demonstrate that the College lacked a rational basis for its decision to release him from the Program.  Furthermore, with regard to plaintiff's equal protection claim, there is no evidence that plaintiff was treated any differently from any other student, much less that no rational basis existed for any difference in treatment.  Accordingly, plaintiff cannot prove a violation of the Equal Protection or Due Process clauses of the Fourteenth Amendment.

## D.    Right to Privacy

In his amended complaint, plaintiff asserts that defendants violated his Fourth Amendment right to privacy because they disclosed plaintiff's drug screen results to Riverbend.[25]   However, he does not make any argument related to this claim in his brief, and he has not offered any evidence to support the allegation that defendants

---

[25]*See* doc. no. 28 (amended complaint), at 8-10.

actually did disclose any information to Riverbend.  Accordingly, summary judgment is due to be granted on plaintiff's claim against Shelia Smith and the College for violation of his Fourth Amendment right to privacy.

**E.      42 U.S.C. § 1985**

In his amended complaint, plaintiff alleges that Smith and the College conspired with Riverbend and Ken Delano in order to discriminate against him and violate his federal rights, in violation of 42 U.S.C. § 1985(3).[26]  According to plaintiff, the conspiracy involved the College disclosing his positive drug screen to Riverbend, so that Riverbend would dismiss him from the after care program, so that the College, in

---

[26]42 U.S.C. § 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

turn, would have a reason to dismiss plaintiff from the ADN Program.[27]

> The elements of a § 1985(3) conspiracy claim are as follows:
>
> (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Cook v. Randolph County, Ga.*, 573 F.3d 1143 (11th Cir. 2009) (citing *Childree v. UAP/GA CHEM, Inc*., 92 F.3d 1140, 1147 (11th Cir.1996)).

Plaintiff has no evidence of a conspiracy, or of any act taken in furtherance of a conspiracy. He *alleges* that Smith wrongfully sent a copy of his positive drug screen to Riverbend in an effort to have him removed from Riverbend's aftercare program, but he offers no evidence to support that allegation. Instead, the evidence demonstrates that plaintiff was the one who first disclosed his methadone use to Riverbend.[28] Plaintiff also *alleges* that the College put pressure on Riverbend to remove him from the aftercare program by threatening or implying that Riverbend's failure to detect plaintiff's drug use would be publicized; but, again, he offers no evidence to support that allegation.[29] Absent any evidence of a conspiracy, or of any overt acts taken in

---

[27]*Id.* at 12-13.

[28]*See* Defendants' Exhibit 15.

[29]Plaintiff does produce a tape recording of meetings he had with Shelia Smith. He allegas that, during those meetings, Smith informed him she would contact Riverbend regarding his positive drug screen results. *See* Plaintiff's Exhibit L. Even assuming the admissibility of these recordings

furtherance of a conspiracy, plaintiff's § 1985(3) claim must fail.

**F.     State Law Claims**

The only remaining claims against the College and Smith are plaintiff's state law claims for tortious interference with contract, breach of contract, negligence, and civil conspiracy. This court's jurisdiction over those claims is founded upon 28 U.S.C. § 1367(a), which provides that,

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). The district court may decline to exercise supplemental jurisdiction when:

> (1)    the claim raises a novel or complex issue of State law,
>
> (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

---

(which is questionable), the recordings prove only that Smith considered contacting Riverbend, not that she actually did make contact.

    Plaintiff also suspects there is written correspondence between the College and Riverbend evidencing their alleged conspiracy, but that correspondence has not been made part of the record. As such, it cannot be considered as evidence to support plaintiff's claim. Plaintiff requests an opportunity to conduct additional discovery in order to unearth this alleged correspondence. *See* doc. no. 42 (plaintiff's brief), at 43. Plaintiff's request is denied. The deadline for completing discovery expired on August 3, 2009. *See* doc. no. 24 (Scheduling Order). Furthermore, this case has been pending since October 9, 2008, *see* doc. no. 1 (Complaint), and plaintiff claims that the correspondence in question was sent prior to September 29, 2008. Consequently, plaintiff has had ample opportunity to discover this information, and the court is unwilling to re-open discovery at this late stage in the litigation.

(3)     *the district court has dismissed all claims over which it has
        original jurisdiction*, or

(4)     in exceptional circumstances, there are other compelling reasons
        for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied).  "[I]n the usual case in which all federal-law

claims are eliminated before trial, the balance of factors to be considered under the

pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity

— will point toward declining to exercise jurisdiction over the remaining state-law

claims." *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988).

Here, plaintiff's federal claims against Smith and the College have been

eliminated.  Accordingly, this court declines supplemental jurisdiction over the

remaining state law claims against those defendants, and exercises its discretion to

dismiss those claims.

## V. CONCLUSION AND ORDERS

In accordance with the foregoing, the court finds there are no genuine issues of

material fact with regard to any of plaintiff's federal claims against defendants

Northwest-Shoals Community College and Shelia Smith, and that supplemental

jurisdiction over plaintiff's state law claims against those defendants should be

declined.  Accordingly, the motion for summary judgment filed by Smith and the

College is GRANTED.  It is ORDERED that plaintiff's claims against Smith and the

College for violations of the ADA, the Rehabilitation Act, the equal protection and due process clauses of the Fourteenth Amendment, the Fourth Amendment right to privacy, 42 U.S.C. § 1985, and FERPA are DISMISSED with prejudice. It is further ORDERED plaintiff's state law claims against Smith and the College for tortious interference with contract, breach of contract, negligence, and civil conspiracy are DISMISSED, but without prejudice to plaintiff's right to refile those claims in an appropriate state court, if he chooses to do so. Finally, it is ORDERED that plaintiff and defendants Riverbend Center for Mental Health and Ken Delano must file a joint report on or before May 25, 2010, detailing the status of plaintiffs' claims against those defendants.

DONE this 17th day of May, 2010.

_____
United States District Judge